UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID BENNETT,<br><br>       Petitioner,<br><br>   v.<br><br>DEBBIE ASUNCION,<br><br>       Respondent. | Case No. 16-cv-01918-JD<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**<br><br>Docket Nos. 39, 40, 41 |

David Bennett, a pro se state prisoner, has brought a habeas petition pursuant to 28 U.S.C. § 2254. The Court ordered respondent to show cause why the writ should not be granted. Respondent filed an answer and a memorandum of points and authorities in support of it, and lodged exhibits with the Court. Bennett filed a traverse. The petition is denied.

## BACKGROUND

On July 11, 2013, Bennett was found guilty at a bench trial of three counts of second degree burglary and one count of using a stolen access card. *People v. Bennett*, No. H042325, 2015 WL 4537450, at *1 (Cal. Ct. App. July 28, 2015). The trial court found that Bennett had one prior strike conviction and had served two prior prison terms. *Id.* On November 4, 2013, the trial court sentenced Bennett to a total prison term of four years to run consecutive to a term of six years, the sentence handed down in a separate case after a jury convicted him of reckless driving while evading a police officer; resisting; delaying, or obstructing a police officer; being under the influence of a controlled substance; and driving under the influence of drugs. Answer, Clerk's Transcript ("CT") at 690-92.[1]

---

[1] For the remainder of this order the Court will refer to these two cases as the "burglary case" and the "DUI case." While this petition only involves claims related to the burglary case, the procedural history of the DUI case is relevant to the claims.

Bennett filed a direct appeal with the California Court of Appeal raising claims not presented in this federal petition. *Bennett*, 2015 WL 4537450, at *1. Bennett also filed a habeas petition with the California Court of Appeal raising the same claims he now asserts in this federal petition. The California Court of Appeal affirmed the judgment on direct appeal on July 28, 2015, and summarily denied the habeas petition. *Bennett*, 2015 WL 4537450, at *1; Answer, Ex. 12. Bennett then filed a petition for review with the California Supreme Court. He did not raise in his petition for review the same claims he raises now. Answer, Ex. 9. The California Supreme Court denied review on September 30, 2015. Answer, Ex. 10. On April 1, 2016, Bennett filed a habeas petition with the California Supreme Court raising the claims he had previously raised in his habeas petition to the California Court of Appeal. Answer, Ex. 13. These are the same claims now before the Court in his federal petition. On May 18, 2016, the California Supreme Court denied the petition, citing *In re Swain*, 34 Cal. 2d 300, 304 (1949).[2] Answer, Ex. 14.

## STATEMENT OF FACTS

On February 23, 2011, Heather Klosterman's wallet was stolen from a residence in Campbell, in Santa Clara County. Reporter's Transcript ("RT"), at 909-10, 915. The wallet held Klosterman's driver's license, a Wells Fargo Visa debit card ending in 7007, a Visa credit card ending in 1621, and other items. *Id*. at 910-13. Klosterman did not discover that her card was missing until the next day, February 24, 2011. *Id*. at 910, 915. She called her bank and discovered that two charges had been made at a company called 420 Lifestyles. More fraudulent charges were made at a Dairy Queen restaurant, Safeway, and Super America. All the charges were made on February 24, 2011, and they exceeded $600. *Id*. at 914, 916.

Frank Moreno, owner of 420 Lifestyles, testified that he was working on February 24, 2011 when a man later identified as Bennett came into the store with two other men. RT at 829-30. Bennett brought T-shirts and other merchandise to Moreno at the register, and paid for them with a Visa card ending in 7007. RT at 830, 834-36. Bennett swiped the card and signed the

---

[2] As will be discussed, the claims in the federal petition were not denied on the merits by the California Supreme Court; therefore, the Court reviews the claims de novo. While the claims are most likely procedurally defaulted out of an abundance of caution the Court has reviewed the claims on the merits.

digital receipt. *Id*. at 831-32, 835-36, 852. Soon after, one of the men who was with Bennett brought T-shirts and smaller merchandise to the register. Bennett paid for the items using the same card and signed the digital receipt. *Id*. at 831-33, 835-36.

Nancy Villa Gonzalez was working as a cashier at a nearby Dairy Queen restaurant that day. RT at 871, 874. She testified that a man later identified as Bennett came into the restaurant and, in three transactions, bought three gift cards worth $100, $60, and $56. Bennett signed the receipts for each transaction. RT at 872-73, 875, 880, 895-97.

The next day, February 25, 2011, Bennett attempted to return the T-shirts at 420 Lifestyles. Moreno asked petitioner for his receipt and credit card. Bennett showed Moreno the receipt but said he did not have the card. RT at 837-38. Moreno told Bennett he could not give him a cash reimbursement but could credit the amount to the card. Bennett left with the clothes and never returned. *Id*.

The following day, Bennett, with a friend, went to the Dairy Queen and bought food with a gift card. RT at 921, 931-32. Assistant Manager Jessica Zumwalt noticed the high value on the gift card, but thought the card was a Christmas or birthday gift. She talked to Bennett and thought it "odd" that he argued about paying for an "extra" when there was so much money on the card. *Id*. at 932. On March 3, 2011, Zumwalt was again working at the Dairy Queen when a man, later identified as Sammy Hagos, came in and bought food with one of the gift cards. RT at 929, 990-92. Zumwalt thought the man was one of Bennett's friends. *Id*. at 929. Police were called, but after determining that Hagos did not know the gift card was associated with the stolen credit card, they did not arrest Hagos. *Id*. at 992.

Also on March 3, 2011, Sergeant Stacy Macfarlane went to 420 Lifestyles to investigate. RT at 853-54, 956-57. Macfarlane asked Moreno for a description of the person who purchased the items using a stolen card. RT at 853-55, 956. Moreno described the person as a black male adult between 5'7" and 5'10" tall. He had a dark complexion, medium build, and spoke with an accent. RT at 855-56. Moreno showed Macfarlane store surveillance video depicting Bennett trying to return T-shirts. Macfarlane took a still shot of petitioner from the video. Footage from the previous day, when the purchase had been made, had been erased. *Id*. at 839-41, 853. The

United States District Court
Northern District of California

video was played for the court. *Id*. at 841-42.

Next, Macfarlane went to see Zumwalt at the Dairy Queen. Macfarlane asked Zumwalt to look for credit card sales receipts from February 24, 2011, with the name Heather Klosterman, for the amounts of $100, $60, and $56. RT at 921-24, 957, 958. Zumwalt located the receipts showing the gift card purchases. *Id*. at 926. Macfarlane asked Zumwalt if she recalled anything out of the ordinary, and Bennett "popped into [Zumwalt's] head." *Id*. at 932. Zumwalt showed Macfarlane surveillance footage of Bennett purchasing a gift card from Gonzalez. *Id*. at 926-27, 929, 959. Zumwalt told Macfarlane that she recognized Bennett because he had been to the restaurant on several prior occasions. Zumwalt had had at least one prior conversation with him. *Id*. at 986. Macfarlane took a still shot from the surveillance video of petitioner making the purchase. *Id*. 927, 958-59. At trial, Zumwalt said she recognized Bennett when she saw him in the video, and identified Bennett as the person shown in the video buying a gift card. *Id*. at 927-28.

Macfarlane showed Gonzalez the picture of petitioner buying a gift card from her. RT at 882-83, 965-66. Gonzalez recalled the transactions and recognized Bennett. She remembered the transactions because of the gift cards' high amounts. *Id*. at 881, 883.

Since the fraudulent purchases had occurred at stores in the same area, Macfarlane decided to visit neighboring businesses to see if people recognized Bennett. RT at 959. Macfarlane went to the nearby Checks to Cash store, where she spoke with Andrew Dunn. Macfarlane showed Dunn a still photo of petitioner from the 420 Lifestyles surveillance video. *Id*. at 934, 959-60. Dunn recognized Bennett. He said Bennett had been to his store a week or two before and filled out an application for a prepaid debit card. Bennett provided his name and birthdate in the application. *Id*. at 935-38, 960. Dunn gave Macfarlane a copy of the application. *Id*. at 938, 960. At trial, Dunn identified Bennett as the same person in the photo that Macfarlane showed him. *Id*. at 935.

Using the information in Bennett's prepaid debit card application, Macfarlane was able to locate a booking photo of Bennett. RT at 960. Macfarlane compiled a photo lineup and placed Bennett's photo in position three. *Id*. at 960-961.

4

On March 4, 2011, Detective Frank Saunders, who had not seen any photos or videos of petitioner, accompanied Macfarlane to 420 Lifestyles. There, Saunders showed Moreno six headshots, one at a time. Moreno saw photo number three of petitioner, and said, "90 percent sure that's him." RT at 843-44, 942-49, 955, 962. At trial, Moreno identified Bennett as the person who made the purchases and then tried to return items the next day. RT at 868-69. Moreno testified that the transactions were particularly memorable because they were large transactions that occurred one after the other. He also recalled Bennett's face because his dog barked at Bennett, which was unusual. Additionally, Bennett came back a couple of days later and asked for a refund, but never came back with the credit card to receive the refund. Further, the police officers arrived shortly after to investigate the credit card fraud, so the transactions were "really fresh in [Moreno's] mind." *Id*. at 867-69.

Also on March 4, 2011 Saunders and Macfarlane went to the Dairy Queen. Saunders showed Gonzalez the same six photos, one at a time. RT at 884-85, 941-46, 964-66. Gonzalez saw photo number three of Bennett, responded, "Yeah, that one," and initialed the photo. RT at 884, 886, 894-97, 955, 966-68. At trial, Gonzalez said Bennett looked similar to the person who had purchased the gift cards from her. RT at 896.

On March 5, 2011, Macfarlane learned that Bennett was at a residence a couple of blocks from 420 Lifestyles and the Dairy Queen. Bennett was taken into custody. RT at 968.

### STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Section 2254(d) applies when the claim was "adjudicated on the merits" in state court. Unexplained as well as reasoned decisions are covered by § 2254(d). When it is clear that a claim was not adjudicated on the merits in state court, for instance because the state court invoked a

procedural rule that is not a procedural bar to considering the claim in the federal habeas proceeding, the claim is subject to de novo review. *See Taylor v. Beard*, 811 F.3d 326, 331 n.3 (9th Cir. 2016) (en banc) (conducting de novo review where state courts rejected claim on procedural grounds and did not consider merits); *Pirtle v. Morgan*, 313 F.3d 1160, 1167-68 (9th Cir. 2002) (after concluding that claim was not procedurally barred, conducting de novo review because state supreme court never reached merits of the claim).

The claims in this federal petition were denied by the California Supreme Court with a citation to *In re Swain*, 34 Cal. 2d 300, 304 (1949). A citation to *In re Swain* can reflect either an untimely petition or that the petition did not present the claims with sufficient particularity. *Curiel v. Miller*, 830 F.3d 864, 870-71 (9th Cir. 2016). Bennett's state petition appears timely; therefore, it is probable that the state court concluded that the claims were not fairly presented. But where a petitioner maintains that the state procedural denial based on *In re Swain* was erroneous because he did allege his claims with particularity and that they are incapable of being alleged with any greater particularity, this Court cannot automatically find the claims unexhausted. *See Kim v. Villalobos*, 799 F.2d 1317, 1319-20 (9th Cir. 1986). Rather, this Court must independently examine the petition presented to the state court to determine whether the claims were fairly presented. *See id*. at 1320 (if state procedural requirement consistently prevents fairly presented claim from being heard on merits, state's procedures are ineffective and exhaustion requirement is excused).

A review of the petition to the California Supreme Court indicates that the claims were not presented with sufficient particularity. But since respondent briefed the merits of the claims and in light of our circuit's decisions on this issue, the Court will review the claims on the merits. Because the state court did not reach the merits of the claims, the review is de novo.

As grounds for federal habeas relief, Bennett contends that: (1) trial counsel rendered ineffective assistance; (2) the prosecutor violated *Brady v. Maryland*, 373 U.S. 83 (1963); and (3) appellate counsel rendered ineffective assistance.

### INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Bennett says that trial counsel was ineffective because she: (1) failed to relitigate a motion

to suppress; (2) failed to call Sammy Hagos as a witness or challenge the photo line-up; (3) failed to obtain discovery; (4) sexually harassed Bennett and engaged in sexual relations with him; and (5) misadvised Bennett to waive a jury trial.

**Legal Standard**

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.*

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

**Background**

Bennett had a lengthy history of clashing with the trial court before his trial even began, seeking to represent himself and then later requesting the representation of Kristin Carter, the attorney at issue in this ineffective assistance of counsel claim.

**Early Proceedings**

A felony complaint was filed against Bennett in the burglary case on March 9, 2011, and in the DUI case on December 7, 2011. CT at 91-92, 95-96. Bennett was initially represented by a private attorney in the burglary case and by attorney Carter, a public defender, in the DUI case. *Id.* at 3, 26.

On November 28, 2012, petitioner moved to represent himself in the DUI case pursuant to *Faretta v. California*, 422 U.S. 806 (1975). CT at 257. The trial court denied the motion without prejudice, stating that Carter was a "very experienced attorney," and "[f]rankly, you lucked out

because Ms. Carter has an excellent reputation.  If you had to take anybody from the Public Defender's Office to represent you in a felony case, you did well with Ms. Carter."  RT at 30-31.  Bennett agreed, stating he would like to represent himself but "I know I've had a real good attorney.  I know that."  *Id*. at 33.

On December 4, 2012, petitioner's private attorney filed a motion to suppress in the burglary case.  CT at 259.  The motion alleged that Bennett had a reasonable expectation of privacy in the debit card application he had submitted to the Checks to Cash store, and thus officers were required to obtain a warrant before obtaining that application.  On March 13, 2013, Bennett moved to represent himself in the burglary case.  *Id*. at 286.  In his motion, Bennett wrote that he attended the New York State University of Criminal Defense and West Valley College, with "honors."  *Id*. at 287.  The motion to represent himself [in the burglary case] was granted.  *Id*. at 295.

### Hearing on Motion to Suppress

Bennett's motion to suppress in the burglary case was heard on March 19, 2013.  CT at 297; RT at 42-78.  Representing himself, Bennett testified by reading from the People's opposition to the motion to suppress.  The court eventually interrupted Bennett, explaining it could read the papers.  RT at 60-63.  When asked to provide factual testimony, Bennett argued that Officer Macfarlane had violated his privacy by obtaining his debit card application without a warrant, that he was innocent of the charges, and that the real suspect was the person whom officers had found with the Dairy Queen gift certificate-Sammy Hagos.  *Id*. at 63-67.  Bennett invoked his Fifth Amendment rights on cross-examination, leading the court to strike his testimony.  *Id*. at 69-70.

At the end of the hearing, the court asked Bennett if he wanted to file additional papers.  Bennett said he was satisfied with the motion that had been filed on his behalf.  RT at 72.  The court denied the motion, finding there was no search under the Fourth Amendment because Bennett had no reasonable expectation of privacy in his debit card application.  The court also found that because the Checks to Cash store was not analogous to a financial institution, officers were not required to obtain a warrant before obtaining the application.  *Id*. at 77-78, 80.  After the motion was denied, petitioner asserted he was entitled to relief and asked if he could refile the

motion. *Id*. at 79. The court told Bennett that there was a process to obtain review of the ruling and that he would have to pursue the review on his own since he was representing himself. *Id*. Bennett subsequently filed a number of motions, nearly all of which alleged to some degree that he had been arrested without probable cause and that the motion to suppress the debit card application had been wrongfully denied. CT at 314-27.

### Further Proceedings and Bennett's Request for Attorney Carter

The burglary case was subsequently sent to a new judge, the Honorable Linda Clark, for trial. RT at 91, 94. The parties appeared before Judge Clark to discuss trial readiness on April 23, 2013. *Id*. At that time, the court indicated it had "read the entire file. I have read all of the previous documents that you filed, including the *Faretta* motion waiver form that you completed and filed in this case. I brought myself fully up to date on everything that's happened up to this point." *Id*. at 95. The court said it had reviewed Bennett's criminal history and did not believe he had been out of custody long enough to receive the legal education he had claimed in his *Faretta* motion. *Id*. at 99. Upon questioning by the court, Bennett admitted he had never attended school and had never obtained a degree, but maintained that people who had attended New York State University "gave me some information about criminal proceedings and stuff." *Id*. at 96-99. The court said it had serious concerns about Bennett's "efforts to manipulate the Court and to manipulate this case. The information that you placed on your *Faretta* waiver, sir, I believe to be false, and that gives me great concern." *Id*. at 100.

The court proceeded to discuss the motions Bennett had filed. RT at 100-03. In relevant part, the court told Bennett, "[y]ou basically reraise your 1538.5 claim that the police should not have been able to obtain your credit application." *Id*. at 103. The court said the case had been on the trial calendar for an "extensive period of time," that the parties had been ready to proceed when Bennett was granted the right to represent himself based on false representations, and that since that time, "you have declared ready on at least two occasions and then announced not ready when you were delivered to the trial department." *Id*. at 104. The court said it would not revoke Bennett's pro per status, but urged petitioner to proceed with an attorney. *Id*. at 105-08. Bennett responded, "I don't want to go to trial, but I know that I would win if I went to trial based on the

1   evidence that was discovered and based on the officer did perform an unlawful arrest." *Id*. at 108.

2       Bennett complained that he was not allowed to finish reading the motion at the suppression

3   hearing because "[e]verybody got bored and didn't want me to read." RT at 109. He said he had

4   an expectation of privacy in his debit card application. *Id*. The court explained that the motion to

5   suppress had been properly decided against Bennett: "And in this Court's view, the decision that

6   was made was the only one that could have been made. There was no expectation of privacy in

7   documents that are delivered to a third person such as was done in the case of your loan-credit

8   card application." *Id*. at 109-10. Bennett said he wanted to continue to represent himself, but

9   insisted that he wanted the evidence against him suppressed. The court reiterated that Bennett

10  could not relitigate the motion to suppress. The court said it set aside May 2, 2013, to review each

11  of Bennett's motions, *Id*. at 113, and said it would set the case for trial after that. The court gave

12  Bennett a week to file any additional supplemental papers. *Id*. at 110-11.

13      On April 23, 2013, petitioner filed the following motions; an in limine motion to suppress

14  the identification evidence; a motion to set aside the information for illegal search and seizure

15  under Penal Code section 995; a motion to set aside the indictment because the district attorney

16  failed to present exculpatory evidence to the grand jury; another motion alleging discriminatory

17  prosecution; and a motion to suppress the evidence of his identification under Penal Code section

18  995. CT at 336-62.

19      On May 2, 2013, the parties convened to discuss Bennett's motions and trial readiness. CT

20  at 380. Attorney Carter, who was representing petitioner in the DUI case, was present. RT at 123.

21  The court reviewed and denied Bennett's motions, finding that they all stated inapplicable legal

22  claims or had previously been denied. *Id*. at 124-53. Despite the court's previous admonishments,

23  Bennet had been attempting to relitigate the motion to suppress, arguing that the fruits of the

24  search should have been excluded. *Id*. at 146-47. The court reiterated that "the Court has ruled

25  that the search and seizure was lawful." *Id*. at 148. The court told Bennett: "You have filed a stack

26  of paper that is equal to the size of the entire file so far. And everything in here is an attempt to

27  reargue something that has already been argued and decided. That's called abuse of process." *Id*.

28  at 148-49. The court explained that there were means for Bennett to review the court's rulings,

but that he could not do so by simply refiling the same motion. *Id*. at 149.

Petitioner then moved to dismiss the case for discovery violations. RT at 158, 160. Bennett explained that he had requested but had not received from the prosecutor "the Dairy Queen gift card that was confiscated [from Hagos]," "[p]ictures of suspect Hagos," and "a photo lineup of that suspect [Hagos]." *Id*. at 154-55. In response, and referring to the police report, the prosecutor said that no photo lineup had been conducted with Hagos and that the gift card confiscated from Hagos had been returned to the Dairy Queen. *Id*. at 155-56. The prosecutor said she had not received the photo of Hagos that had been attached to the police report but would request it from the police department. *Id*. at 158.

In response to Bennett's allegations of discovery violations, the trial court told petitioner he could have additional time to review the evidence if needed. RT at 158-59. "[I]f it creates some problem for you in preparing for trial, you can bring that up when appropriate." *Id*. at 159. Bennett stated that it was racial profiling for the police not to investigate Hagos. *Id*. "So the defense has the right to-has grounds to question the fairness of the photo lineup because of that encounter . . . ." *Id*. at 160. The court stopped petitioner and explained that he was not precluded from challenging the photo lineup, and could do so until the eve of trial if he chose. *Id*.

After Bennett's motion to dismiss was denied, the court set the case for trial. RT at 162. Bennett then requested a court-appointed attorney. *Id*. at 163. Bennett told the court, "If Kristin Carter is willing to take over the case with your permission, I wish that she can, if possible." *Id*. at 164. The court appointed attorney Carter. *Id*. at 165. The court noted that the case "has been ready to proceed for some time, been through the entire litany of pretrial motions on several occasions, 995, 1538.5. Sort of sounds like there may be a pretrial identification photo lineup issue that may be out there waiting to be raised. I don't know. Certainly Mr. Bennett has suggested that." *Id*. at 165. The court said the case was not complicated, but set trial for August in order to give the defense enough time to prepare and obtain discovery. *Id*. at 165-67.

### Preparation for Trial and *Faretta* Request

On June 10, 2013, a week before the DUI trial began and three weeks before the burglary trial began, Bennett again requested that he be allowed to represent himself in the burglary case.

RT at 172-73. The court told Bennett that attorney Carter had announced she was ready for trial in both cases. The court cautioned that if it granted Bennett's request to represent himself, Bennett would not be given another continuance to prepare for trial. *Id*. at 174. Bennett said he was ready for trial and responded in the affirmative when the court asked if he was ready to put on his own evidence and respond to the district attorney's evidence. *Id*. at 174-75. Bennett stated, "I'm very familiar with the theft case and that's why I would like to represent myself. I'm very familiar with it and I have-I'm familiar with the manipulation of the trial and I have prepared my defense." *Id*. at 176. The court deferred deciding the motion.

Trial began on the DUI case on June 18, 2013. CT at 409. That day, the court denied Bennett's request to represent himself in the burglary case. Augmented Reporter's Transcript (ART) at 15. The court reminded Bennett that it granted his last request for an attorney because he previously stated he would be better off with an attorney and wanted to forfeit his pro per status. *Id*. at 14. The court rejected Bennett's explanation that he previously requested an attorney because he could not prepare for trial due to a family emergency, explaining that Bennett had first mentioned that family emergency months earlier, unrelated to his *Faretta* request. *Id*. at 15. The trial court stated:

> I believe that because of what are clearly demonstrated efforts to manipulate this Court that you are either unwilling or unable to abide by courtroom proceedings and protocols.
>
> Now I'm not going to go over the entire litany of events that lead me to this conclusion. I'm going to summarize them.
>
> You have been throughout these proceedings known to make constant interruptions. I have had to comment on it a number of times. You have made efforts to speak over the Court when the Court is speaking. Now that's not going to show up in the record. There's a couple times you actually admitted it on the record, but basically my reporter's practice is if I'm talking and you start talking over me, or if your attorney is talking and you start talking over her, the reporter will do her best to only report me or the attorney because she can only pick one. So that has been a big problem.
>
> And when I talk about your efforts to mislead, sir, and to manipulate, I'm talking about such things as the information that you give to the Court that is constantly changing, particularly on close scrutiny. I also know that Doctor Barron when he examined you, reported to this court that to a reasonable degree of psychiatric certainty, you are feigning or exaggerating symptoms. There is

mention that it's been reported that you do so to gain attention or to get your personal needs or desires met.

. . . .

This case is set for trial and is going to proceed to trial on July 8. I have great concerns as I have indicated, sir, that because of the outbursts, because of your talking over me, because of your talking over your attorney, because of your efforts I truly believe to manipulate this Court, and there's a lot that just isn't going to appear on the record . . . and also because your demeanor does not appear in the record, I am going to deny your *Faretta* motion at this time and Ms. Carter will continue to represent you in this case.

*Id*. at 15-17.

### DUI Trial

Attorney Carter represented petitioner in trial on the DUI case. Carter's strategy was to obtain an acquittal for petitioner on counts 1, 2, and 3-reckless driving while evading an officer, carrying a concealed dirk or dagger, and evading police. RT at 215-19, 652-80. To do so, Carter presented two witnesses on Bennett's behalf. First, a psychiatrist testified that Bennett's actions were consistent with meth-induced psychosis. RT at 492-520. Second, Bennett's mother testified that she and Bennett carried tools for their work in construction, and that a box-cutter, which petitioner had been found with, was one such tool. *Id*. at 532-35. The trial concluded on June 26, 2013. Bennett was found guilty of several counts, but the jury hung on count two, possession of a concealed dirk or dagger, based on the box cutter, and the court subsequently dismissed the count on the prosecutor's motion. CT at 472-79, 513.

### Burglary-Trial Preparation, *Marsden* Hearing and *Faretta* Request

On July 3, 2013, the parties convened for a status update on the burglary trial. RT at 748. Carter said she was ready for trial. *Id*. at 750. Bennett interrupted the court, insisting he wanted a hearing to remove Carter pursuant to *People v. Marsden*, 2 Cal. 3d 118 (1970). *Id*. at 748-49. The court stated that Bennett was "in a very hostile posture" and cautioned that he may need to be removed from the courtroom. *Id*. at 749-50.

Nonetheless, the court held a *Marsden* hearing. Petition at 51-59. At the hearing, Bennett complained about Carter's performance during the DUI trial, claiming that she should have brought a motion to dismiss the case after the trial; should have presented mental health evidence

from 2004 to support his claim of meth-induced psychosis; told him to be quiet during trial, and called his mother as a witness without his permission. Petition at 51-55. Bennett also complained that Carter declined to file a motion to dismiss in the burglary trial. *Id*. at 53-54.

The court ruled it would not discharge Carter. Petition at 55. Regarding the DUI case, the court agreed with Carter that there was no basis to move to dismiss the case after the conclusion of trial. The court also said that evidence of petitioner's 2004 meth-induced psychosis was likely inadmissible because it was irrelevant to petitioner's condition in 2011. *Id*. at 56-57. The court noted that the expert witness Carter procured in the case was "one of the best expert witnesses I have heard in my entire career. I don't know where you found her. But she was awesome, sir, and I have seen a lot of expert witnesses testify." *Id*. at 56. The court found "nothing about [Carter's] failure to introduce that evidence that is incompetent. Quite the contrary." *Id*. at 57. The court also said that it witnessed Carter silencing petitioner during trial, and that Carter did so because petitioner was being disruptive during the prosecution's closing argument. *Id*. Finally, the court said that the only reason Bennett was acquitted of count 2 was because Carter presented his mother as a witness. *Id*. at 57-58.

Regarding Bennett's complaints in the burglary case, the court said the "same thing applies. Previous motions have already been litigated and they have been denied. [Carter] is not allowed to bring another one. She couldn't if she wanted to. Even if there were grounds, which she says there are not, I have to accept that. I accept it because the previous ones have been denied and because Ms. Carter is making her best legal judgment in that regard." *Id*. at 57.

The court said Carter was correct in telling petitioner that she would not simply do what he asked: "The law says she makes the tactical decisions. That's why you have a lawyer, sir. Is because [sic] she understands things like you can't bring another 995 motion." *Id*. at 58. The court concluded:

> There is simply nothing, sir, in what you have said that establishes that Ms. Carter has been in any way ineffective, incompetent or less than a vigorous advocate for your right.
>
> And so I find that to the extent there is any conflict between you or any communication problem between you, it is, sir, as a result of your lack of understanding about these things and as what I perceive

> to be a very high level of frustration on your part. But understand, sir, that I do not find that that frustration is in any way justified or founded on any failure of Ms. Carter to fully represent your interests.

*Id*. at 58-59.

Bennett then requested that he be allowed to represent himself. The court denied the motion, stating it had previously denied his *Faretta* request based on his efforts to manipulate the court and due to his disruptive behavior. RT at 780. "The only exception to that [disruptive behavior], sir, that I have seen is when Ms. Carter was representing you." *Id*. Bennett said the court should be disqualified, that he did not "even want you as a judge," and accused the court of prejudice and discriminatory prosecution, exclaiming "you guys are fucking racists." *Id*. at 781. Bennett was removed from the courtroom. He had to be "removed physically from his chair," and was "yelling, resisting the deputies." *Id*. Even after being removed, he continued to be "vocal" in the court's holding cell. *Id*. at 782.

**Burglary Trial Motions in Limine**

On July 8, 2013, during a hearing on motions in limine, Bennett interrupted the court to say he wanted a *Marsden* hearing "to state my complaint" that he and attorney Carter were "not getting along right now. There is a conflict of interest." RT at 788. Carter said there was no conflict of interest. Bennett said that after voicing his complaint he would move to represent himself. *Id*. When the court said it would not hear his complaint, Bennett told the court: "You are going to hear my complaint because it's my right to freedom of speech." *Id*. at 789. Bennett said he had a problem with Carter and pointed a handful of papers in her direction. *Id*. Petitioner said he wanted Carter to move to dismiss the DUI case but Carter did not do so. *Id*. at 791.

The court told Bennett that he had already raised those issues. RT at 791. He became "extremely agitated." *Id*. The court reiterated that Bennett's concerns over "what happened at a previous trial which you have raised on a number of occasions have been considered by me and your request has been denied." *Id*. at 792. Bennett then said:

> You don't understand what's going on. There is a problem here. Ms. Carter is harassing me. All right.
>
> She says she wants to have sex with me and stuff. And I said, I want-I ain't got time for this. I'm an inmate. And pretty much I'm

United States District Court
Northern District of California

> like, this is not cool because I'm being harassed here. I just want to get to the fact-the facts-get the facts straight about my case. I do not want to be around that lady.
>
> I do not want to talk to her about this case because she is treating me as a fool based on the facts and everything-other efforts put in this case is being disregarded from Steve Defilippis [Bennett's former private attorney] to my representation. She has not continued to where I left off to understand the facts of the case. All right.

*Id*. at 792.

The court told Bennett, "[Carter] has represented you faithfully and well so far and I expect that she will continue to do the same. And if she is unable to, sir, it will be because of your behavior." *Id*. at 793.

Referring to the papers he had pointed at Carter, Bennett said he was in possession of an application to the state bar association and would file a complaint against Carter if he was not allowed to represent himself: "If you do not grant my *Marsden* motion, I will send the application to the chief of trials and he will have to withdraw her bar card. And you guys keep playing like I'm a type of fool. Go ahead. She will not represent me." RT at 793-94. Bennett requested to be removed from the courtroom, and then said: "I told Ms. Carter that I do not want a jury trial, first of all. I told her I did not want a jury trial, ma'am. Okay. Remember that. Ms. Kristin Carter, I do not want no jury trial. I want-I don't want a jury involved in this case. Okay. What the hell is going on? You guys keep playing with me. Why. I'm going to have a federal investigation on you mother fuckers." *Id*. at 794.

Bennett was removed from the courtroom. RT at 794. The court stated for the record that Bennett "became extremely hostile and physical with the deputies. That this occurred after he stood up and said get me out of here. He continues to yell and resist and is currently screaming in the holding cell." *Id*. at 795. After a short recess, and with Bennett still removed from the courtroom, the court went back on the record. In relevant part, the court stated that because it:

> would not reconsider the *Faretta* motion and particularly on the basis of Mr. Bennett's repeated allegations from the prior trial, Mr. Bennett, as I think is fairly clear, became somewhat agitated. Ms. Carter felt the need to move some distance a little further away from him at the counsel table.
>
> Mr. Bennett indicated that if his *Marsden* motion wasn't granted that-and he held up a paper-that he would file a complaint with the

state board against Ms. Carter thus creating a conflict of interest.

> I view this as nothing more than another effort of Mr. Bennett to manipulate these proceedings. He's obviously unaware that the mere filing of a complaint would not create a conflict of interest. But nonetheless, it is a clear effort to manipulate what is transpiring here.

*Id*. at 796.

### Burglary Trial

The burglary trial commenced the next day on July 9, 2013. RT at 812. Carter announced that contrary to her advice and wishes, Bennett wanted to waive a jury trial. RT at 815. The court accepted the waiver after confirming with Bennett that he understood what a bench trial would entail and that his waiver was free and voluntary. *Id*. at 819.

During the trial Carter cross-examined the prosecution witnesses with respect to the identification of Bennett, in that it was weak and that the photo lineup was suggestive. RT at 849, 852, 855-59, 863-65. She also elicited information that Hagos was the one who attempted to use the stolen gift card and was not arrested. RT at 985-86, 991-92. The court found Bennett guilty of all charges. RT at 1015-16. The court explained its verdict, noting that it had reviewed the surveillance video that had been admitted into evidence:

> [T]here was no question in my mind that the face I saw briefly, but the face I saw crossing in front of the camera, was that of the defendant. There's simply no question in my mind. The defendant has an extremely distinctive face. He has a very distinctive chin, very prominent eyebrow ridges. He has a distinctive nose and ears and is a fairly recognizable person.

> But even that aside, there are other factors, again, which counsel also didn't mention. The signatures that appear on the Dairy Queen receipts, the Lifestyle 420 receipts . . . , and the application that was submitted for the [debit] card.

> Although it is clear to this Court that the signature on the receipt using the fraudulent access card are all different, clearly not someone signing a name they are used to signing. They have some extremely distinctive features that also exist in the signature of Mr. Bennett on the application for the Nexis card.

> He has-he uses a great deal of flourish in his writing. And some of the flourish, among the various receipts, are almost identical just to the lay person's eye.

> So that although by the eye would certainly not be sufficient to establish his identity as the perpetrator of this offenses [sic],

certainly does tend perhaps to connect him to those offenses.

> I also do not believe based on my review of the six photographs that were used in the identification lineup procedure are so unduly suggestive somehow that they tend to isolate or identify the defendant such that the witnesses would be likely to make a false identification. That's particularly true in the case of Mr. Moreno whose description of the defendant was quite accurate, at least from again the Court's own observations, including my observations of the photographs taken at that time, in which he looks very similar to the way he appears in court today.

> So for those reasons, I do, as I say, accept the identifications of the witnesses in this case.

*Id*. at 1013-14.

### Sentencing and Further Proceedings

At a presentence hearing in September 2013, Bennett accused the trial court of being oppressive and abusing its power and requested another *Marsden* hearing and to represent himself. RT at 1035-36. The court heard the motion on November 4, 2013. RT at 1040-56; Petition at 63-78. Bennett argued in his motion that, "K. Carter is a liar and sexually touched me during an attorney interview." Petition at 67. He stated at the hearing that Carter had previously told him he was "not getting no bail, and she asked me-to have sex with me, and she touched me on my penis because she couldn't give me oral sex." *Id*. Bennett further alleged that Carter refused to file motions, contacted his mother without his permission and failed to present information about his medication. *Id*. at 68-70. He faulted Carter for not bringing a motion to dismiss based on a violation of his constitutional rights and complained again that there had been no police investigation of Hagos. *Id*. at 70, 72. Bennett told the court, "It's me telling her to enforce the law and she is refusing to," and that Carter "had attitude like some type of hood rat chick, you know. She -- her mind is on sex." *Id*. at 73, 76.[3]

Carter responded that she had filed "every single appropriate motion in this case. There were a number of motions in limine. I made the appropriate objections." *Id*. at 74. Carter confirmed that Bennett had suggested a number of motions and, "I have taken what he has said seriously, considered them, and did not file motions as they were not proper motions, not based on

---

[3] Bennett also attempted to reargue several issues that the court had already ruled on at the prior *Marsden* hearing. Petition at 68-78.

18

the law and not helpful for Mr. Bennett's case." *Id*. at 75.

The trial court addressed Bennett, stating:

> Let me make it very clear. I absolutely do not believe your allegations, your vile allegations, that Ms. Carter has tried to sexually assault you. I don't believe you, sir. I believe that you are lying about that.

> I believed you were lying the first time you said it, and I believe that you were lying when you wrote it in that document, and I believe that you continue to lie about that.

> Just so there's no question here. I have already asked Ms. Carter about that. She wins the credibility test, sir. You lose it.

> And I don't want to hear your continued comments about that.

> Second, I have given you every opportunity to voice a basis in fact for your request to have Ms. Carter discharged as I'm required to do under the law.

> You want to continue to argue legal theories in your case. You want to continue to accost the integrity of your attorney who has represented you diligently and more competently than most attorneys could have done in this case. You are unhappy with your situation. I don't blame you.

*Id*. at 76-77. The trial court further informed Bennett, "[T]here is no basis for this Court to discharge your attorney on the grounds that she has not competently represented you. And the motion is denied." *Id*. at 77.

Carter subsequently moved the court to strike Bennett's strike prior. RT at 1058, 1064-65. When the motion was denied, Bennett attempted to waive sentencing; claimed he was going to obtain a private attorney; and said, "I'm not ready to be sentenced, Your Honor. I'm not ready. I need to get an attorney." *Id*. at 1077. The court sentenced petitioner to a total of ten years in state prison for his convictions in the two cases, and told him he had the right to appeal, during which time Bennett asked if he could go to the Army or "boot camp" instead of prison. *Id*. at 1081, 1087.

**Discussion**

**1. Suppression Motion**

Bennett says that his trial counsel, Carter, was ineffective for failing to relitigate the suppression motion. Bennett's prior attorney had moved to suppress the identification evidence,

before Carter had appointed. RT at 77-80. Bennett chose to represent himself at the hearing on the motion to suppress. The motion was denied on March 19, 2013. Under California law a defendant whose motion to suppress is denied cannot bring another motion to suppress. A defendant's only option is to bring an extraordinary writ within thirty days of the denial of the motion to suppress or to proceed to trial and later appeal the decision. California Penal Code section 1538.5(i)(m). Carter was appointed on May 2, 2013. California law prevented her from bringing another motion to suppress and the time had expired to bring an extraordinary writ. Counsel was not deficient for failing to file either a new motion to suppress or an untimely writ, neither of which would have been allowed under state law. *See Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take a futile action can never be deficient performance."). The trial court informed Bennett immediately after denying the motion to suppress that he needed to follow the established process to have the denial reviewed by a higher court. Bennett proceeding pro se could have filed an extraordinary writ, but chose not to.

Even if trial counsel had been deficient, Bennett was not prejudiced. The trial court ruled that Bennett had no reasonable expectation of privacy in the application he voluntarily submitted to the Checks to Cash store, and that because the Checks to Cash store was not analogous to a bank, there was no statute requiring exclusion of the search. The Supreme Court has held that an individual does not have a reasonable expectation of privacy in bank records, including "checks, deposit slips, . . . financial statements, and . . . monthly statements." *United States v. Miller*, 425 U.S. 435, 442 (1976). California cases have followed *Miller* and found no Fourth Amendment violation when police obtain a suspect's name and address from the post office or telephone company, even where the subscriber has an unlisted number. *People v. Pearson*, 169 Cal. App. 3d 319, 322-25 (1985); *People v. Bencomo*, 171 Cal. App. 3d 1005, 1014-15 (1985). This claim is denied.

### 2. Failure to call Sammy Hagos and photo line-up

Bennett says that trial counsel was ineffective for failing to investigate Hagos and call him as a witness. He also alleges that counsel should have challenged the failure to place a picture of Hagos in the photo line-up.

Counsel's decision not to investigate and call Hagos as a witness was supported by the evidence. Even though Hagos had used one of the gift certificates, there was video surveillance of Bennett purchasing the gift certificate with the stolen card. There was also video surveillance of Bennett attempting to return merchandise purchased with the stolen card. The video surveillance showed Bennett committing the crime. The witnesses also identified Bennett as purchasing the items with the stolen card. It is not clear how further investigation of Hagos would have been helpful. *See Rompilla v. Beard*, 545 U.S. 374, 383 (2005) ("[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."); *Douglas v. Woodford*, 316 F.3d 1079, 1088 (9th Cir. 2003) (the duty to investigate "is not limitless" and does not necessarily require that every conceivable witness be interviewed).

Nor was counsel ineffective for failing to call Hagos as a witness. Bennett does not allege that Hagos would have testified nor does Bennett describe the substance of what his testimony would have been. Bennett cannot establish ineffective assistance of counsel on this basis. *See Wharton v. Chappell*, 765 F.3d 953, 981 (9th Cir. 2014) (remanding for determination of whether defendant's half-brother who lived out of state "would have made himself available as a witness" at penalty phase of capital trial); *Allen v. Woodford*, 395 F.3d 979, 1002 n.2 (9th Cir. 2005) ("the district court correctly disregarded the failure to call [three named witnesses], because Allen failed to make a showing that they would have testified if counsel had pursued them as witnesses"); *Andrews v. Davis*, 798 F.3d 759, 792-93 (9th Cir. 2015) (petitioner failed to present affidavits from purported alibi witnesses); *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000) (petitioner presented no evidence that alleged alibi witness would have presented helpful testimony because he failed to present affidavit from witness).

Counsel was not ineffective for failing to obtain a photo line-up with Hagos. One witness had prior dealings with Bennett, and the other witness had a memorable experience with Bennett. Of course there was also video surveillance of the incidents and Bennett's actions. The trial court reviewed Hagos's photo that was introduced at trial and found that there was no doubt that Bennett was the person in the video. Bennett's remaining contentions are meritless. This claim is

denied.

### 3. Failure to obtain discovery and prepare a defense

Bennett says that his trial counsel did not obtain one of the gift cards or a picture of Hagos and that she failed to prepare an adequate defense. Bennett only presents conclusory allegations with little support which is insufficient to obtain habeas relief. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

The gift card was returned to the store and not used as evidence by the prosecution. A picture of Hagos was admitted as evidence during trial so it appears that counsel had the picture. Regardless, it is not clear how either of these items would have aided Bennett. As described above, there was overwhelming evidence implicating Bennett. Nor is it clear how counsel was ineffective in her defense. Despite overwhelming evidence, the record indicates that counsel thoroughly cross-examined the witness and presented solid arguments. Bennett is not entitled to relief. Even on de novo review the Supreme Court has stated that "[s]urmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

### 4. Sexual Harassment

Bennett claims that he and counsel were in a sexual relationship and she harassed him by texting and showing him nude pictures of herself while in the courtroom. He argues that her legal service became incompetent as a result.

The trial court conducted several hearings with respect to Bennett's desire for new counsel and to represent himself. As noted in detail above, the trial court rejected Bennett's accusations that counsel sexually harassed him. The trial court found that Bennett had fabricated the accusations to create a conflict of interest in order to obtain new counsel. Petition at 76-77; RT at 795-96. The trial court stated:

> Let me make it very clear. I absolutely do not believe your allegations, your vile allegations, that Ms. Carter has tried to sexually assault you. I don't believe you, sir. I believe that you are lying about that.
>
> I believed you were lying the first time you said it, and I believe that you were lying when you wrote it in that document, and I believe

> that you continue to lie about that.
>
> Just so there's no question here. I have already asked Ms. Carter about that. She wins the credibility test, sir. You lose it.

Petition at 76-77.

On habeas review, factual determinations made by the state court are presumed correct and can be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). With respect to credibility determinations, federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Marshall v. Lonberger*, 459 U.S. 422, 433-434 (1983); *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985) ("only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said"); *Sophanthavong v. Palmateer*, 378 F.3d 859, 867 (9th Cir. 2004) ("because the state court conducted an evidentiary hearing in which Mr. Sophanthavong testified, we are required to defer to the state court's credibility findings").

In this case, the trial court had ample opportunity to observe Bennett and counsel in the various *Marsden* hearings and the many other court appearances. Bennett has failed to present clear and convincing evidence to rebut the trial court's determination that he was lying about the accusations. Moreover, a thorough review of the record demonstrates many instances of Bennett attempting to manipulate the proceedings. He lied about attending various colleges and universities when he sought to represent himself. CT at 287; RT at 96-100. Bennett threatened to submit a complaint to the state bar and have counsel disciplined if he did not receive a new attorney. RT at 794. Bennett accused the trial court of being racist and asserted that the trial judge should be disqualified. *Id*. at 781. Bennett later accused the trial court of being oppressive and abusing its power. *Id*. at 1036. He also threatened to initiate a federal investigation on the trial court. *Id*. at 794. As noted above, Bennett had to be forcibly removed from the courtroom on multiple occasions. *Id*. at 781, 794, 1036-37. For all these reasons this claim is denied.

### 5. Jury Trial

Bennett maintains that trial counsel was ineffective for recommending a bench trial and that she promised him that the trial judge would give him benefits if he waived a jury trial. These

allegations are contradicted by the record. During a hearing on motions in limine, Bennett stated:

> I told Ms. Carter that I do not want a jury trial, first of all. I told her I did not want a jury trial, ma'am. Okay. Remember that. Ms. Kristin Carter, I do not want no jury trial. I want-I don't want a jury involved in this case. Okay. What the hell is going on? You guys keep playing with me.

RT at 794. Counsel later told the court:

> I've talked to Mr. Bennett and he's informed me that he would like to waive the jury and proceed by way of court trial. I have advised him of my view on this and I have actually advised him to proceed by way of jury trial.
>
> But he insists that he would like to proceed by way of court trial, and that is his decision and we have discussed it fully.

RT at 815. In the ensuing colloquy Bennett asserted his right to waive the jury. RT at 815-19. Counsel was not ineffective because she did not recommend that Bennett waive a jury trial. This claim is denied.

### ***BRADY* VIOLATION**

It appears that Bennett argues that the prosecutor violated *Brady* by destroying or failing to disclose the gift card that the police confiscated from Hagos and by failing to initially disclose the photo of Hagos.[4]

**Legal Standard**

In *Brady* the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87. Evidence is material if "there is a reasonable probability that, had the evidence been disclosed [to the defense] the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-70 (2009). "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[] confidence in the outcome of the trial.'" *Smith v. Cain*, 132 S. Ct. 627, 630 (2012) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (alteration in

---

[4] Bennett's argument that he was arrested without probable cause does not set forth a *Brady* claim.

original)).

In sum, for a *Brady* claim to succeed, petitioner must show: (1) that the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; (2) that it was suppressed by the prosecution, either willfully or inadvertently; and (3) that it was material (or, put differently, that prejudice ensued). *Banks v. Dretke*, 540 U.S. 668, 691 (2004*); Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

### Discussion

Bennett is not entitled to habeas relief for his *Brady* claim. The gift card and photo of Hagos were not favorable to him, were not suppressed by the prosecution and were not material. The gift card was returned to the store and could have been obtained by the defense. Regardless, he provides no argument as to how the gift card was favorable or material. Similarly, Bennett has not sufficiently described why the picture of Hagos was favorable or material.

To the extent that Bennett contends there was suppressed evidence related to his arrest, he has not identified what specific evidence was suppressed. Bennett was in possession of the police report and was aware of the circumstances of his arrest and the pretrial identification. Bennett filed numerous pretrial motions regarding the circumstances of his arrest. This claim is denied.

### INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Bennett argues that appellate counsel was ineffective because she: (1) failed to appeal the denial of the motion to suppress; (2) failed to appeal the trial court's ruling that the photo lineup was unduly suggestive; (3) failed to raise the issue that Bennett improperly waived a jury trial; (4) failed to allege a *Brady* violation; and (5) failed to withdraw as Bennett's attorney when they were having a conflict of interest.

### Legal Standard

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. *Evitts v. Lucey*, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland*. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). First, the petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue. *Smith*, 528 U.S. at 285. Second, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal. *Smith*, 528 U.S. at 285-86.

It is important to note that appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant. *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983); *Miller v. Keeney*, 882 F.2d 1428, 1434 n.10 (9th Cir. 1989). The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. *See id*. at 1434. Appellate counsel therefore will frequently remain above an objective standard of competence and have caused his client no prejudice for the same reason: because he declined to raise a weak issue. *Id*.

**Discussion**

Bennett has not shown that appellate counsel was ineffective. As discussed above, trial counsel was not ineffective with respect to the motion to suppress, the photo lineup or the waiver of a jury trial. For the same reasons, appellate counsel was not deficient for failing to raise these claims. Appellate counsel had no duty to raise every issue requested by Bennett. *See Jones*, 463 U.S. at 751-54. Even if appellate counsel was deficient for failing to raise these claims there was no prejudice for the same reasons discussed above. Similarly, appellate counsel was not ineffective for failing to raise the *Brady* claim. As set forth by the Court, there was no merit to the *Brady* claim. Furthermore, all of these claims were presented by Bennett in a pro se habeas petition to the California Court of Appeal, which denied the petition. There was no prejudice in appellate counsel's failure to raise these claims because they were denied when presented to the state court.

Bennett also argues that appellate counsel was ineffective for failing to withdraw when there was a conflict of interest pursuant to *Anders v. California*, 386 U.S. 738 (1967). *Anders* is not relevant because it involves the procedure for when appellate counsel believes the appeal is frivolous. *See Anders*, 386 U.S. at 744. In this case appellate counsel did not believe an appeal was frivolous. Indeed, she filed an appeal that was partially successful. Bennett appears to argue merely that he was dissatisfied with appellate counsel's general tactical decisions. Yet, he has failed to demonstrate any conflict of interest.

Bennett sought for appellate counsel to withdraw, yet she informed him that she did not have grounds to withdraw. She explained that he could write to the California Court of Appeal and request a different attorney. Petition at 90. Appellate counsel informed Bennett that she would not file various motions he requested because they were not supported by law. Petition at 90. Appellate counsel's refusal to file frivolous motions does not demonstrate that she was ineffective. *See Jones*, 463 U.S. at 751-54. Bennett informed appellate counsel that if she did not file the motions then she should withdraw or else he would file a habeas petition alleging ineffective assistance of counsel. This still fails to demonstrate a conflict of interest or that appellate counsel was ineffective. Bennett has not shown any prejudice in that he has not shown how any of the unfiled motions would have been successful. To the extent Bennett also argues appellate counsel erred in waiving oral arguments before the California Court of Appeal, he has

failed to show that she was deficient in doing so or that any prejudice resulted. These claims are denied.

## CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Cases, Rule 11(a).

A judge will grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. *Id*. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has made no showing warranting a certificate and so none is granted.

## CONCLUSION

1. The petition for writ of habeas corpus is **DENIED**. A Certificate of Appealability is **DENIED**. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

2. Because the Court has denied the petition, petitioner's miscellaneous motions (Docket Nos. 39, 40, 41) are **DENIED**.

**IT IS SO ORDERED.**

Dated: July 9, 2018

_____
JAMES DONATO
United States District Judge

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DAVID BENNETT,

        Plaintiff,

    v.

DEBBIE ASUNCION,

       Defendant.

Case No. 16-cv-01918-JD

**CERTIFICATE OF SERVICE**

    I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

    That on July 9, 2018, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

David  Bennett
Atascadero State Hospital
P.O. Box 7001
Unit 13 AT#068695-6
Atascadero, CA 93423-7001

Dated: July 9, 2018

Susan Y. Soong
Clerk, United States District Court

By:
LISA R. CLARK, Deputy Clerk to the
Honorable JAMES DONATO

28